**State of WISCONSIN, Plaintiff,**

v.

**STOCKBRIDGE–MUNSEE COMMUNITY, and Robert Chicks, Defendants.**

No. 98–C–0871.

United States District Court, E.D. Wisconsin.

Sept. 30, 1999.

John S. Greene, Assistant Attorney General, Wisconsin Department of Justice, Office of Attorney General, Madison, WI, for Plaintiff.

Brian L. Pierson, Attorney at Law, von Briesen Purtell & Roper, John W. Hein, Attorney at Law, von Briesen Purtell & Roper, Milwaukee, Paul W. Stenzel, Attorney at Law, Stockbridge–Munsee Community Legal Office, Bowler, WI, for Defendants.

### MEMORANDUM AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

GORENCE, United States Magistrate Judge.

The plaintiff, State of Wisconsin, filed this action on September 3, 1998, against the defendants, alleging that defendant Stockbridge–Munsee Community (the Tribe) is operating Class III electronic games of chance at the Pine Hills Golf and Supper Club (Pine Hills) which are specifically prohibited by the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 et seq. The complaint further alleges that the State of Wisconsin and the Stockbridge–Munsee Community entered into the Stockbridge–Munsee Community and State of Wisconsin Gaming Compact of 1992 (compact) for the conduct of Class III gaming as required by 25 U.S.C. § 2710(d)(1)(C) and that by its terms, the compact limits the operation of such games of chance to locations "on tribally owned land or land held in trust by the United States on behalf of the tribe, *but only on such lands within the exterior boundaries of the tribal reservation.*" (Complaint ¶ 13) (quoting Compact, Section XV, Part H [emphasis added]).

The plaintiff also alleges that the Tribe obtained the Pine Hills property and in December 1995, conveyed it to the United States of America to be held in trust for the benefit of the Tribe pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 465. *Id.* ¶¶ 16–17. The complaint further alleges that operation of Class III electronic games of chance at the Pine Hills location is not permitted by the express terms of the compact because the land is located outside the boundaries of the Tribe's reservation and because Pine Hills does not meet the requirements of 25 U.S.C. § 2719(b)(1)(A). *Id.* ¶¶ 19, 20–21.

As relief, the plaintiff seeks a preliminary and permanent injunction prohibiting the defendants from conducting Class III electronic games of chance at the Pine Hills location. The plaintiff also seeks a declaratory judgment identifying the current boundaries of the Stockbridge–Munsee Reservation and declaring that the Pine Hills Golf Course and Supper Club is not located within those boundaries.

The court has jurisdiction over this action pursuant to 25 U.S.C. § 2710(d)(7)(A)(ii) and 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue in this judicial district is proper under 28 U.S.C. § 1391(b). This case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 13.03 (E.D.Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Local Rule 13.05(a) (E.D.Wis.).

Presently pending is the plaintiff's motion for a preliminary injunction prohibiting the defendants from conducting Class III electronic games of chance at Pine Hills pending final disposition of this action. The court held a hearing on plaintiff's motion on October 27 through 28 and 30, 1998.

At the hearing, the following individuals testified on behalf of the plaintiff: James A. Clifton, Ph.D., Scholar–in–Residence, Department of Anthropology, Western Michigan University, Kalamazoo, Michigan, who testified as an expert witness; Chief Deputy Milton Marquardt of the Shawano County Sheriff's Department;

Jeffrey Kuglitsch, Corporation Counsel for Shawano County; and Fred Kafura, a resident of Gresham, Wisconsin. The court also heard testimony from the defendants' witnesses: James W. Oberly, Ph.D., Professor of History, University of Wisconsin at Eau Claire, who testified as an expert witness; Robert Chicks, President of the Stockbridge–Munsee Community Band of Mohican Indians; and Sheila Powless, Land and Enrollment Manager of the Stockbridge–Munsee Community Band of Mohican Indians.

Following the hearing, the parties submitted post hearing briefs and proposed findings of fact and conclusions of law. Subsequently, the parties were granted leave to supplement the record.

Based on the testimony and evidence adduced at the preliminary injunction hearing and the submissions of the parties and upon due consideration of the applicable law, this court will now address the plaintiff's motion for preliminary injunction.

### Preliminary Injunction Standard

At the outset, the court notes that the parties disagree as to the proper standard for determining whether the plaintiff's motion for a preliminary injunction should be granted. The state maintains that it is not required to show irreparable harm and that the "statutory injunction" test should be utilized, while the Tribe contends that the traditional preliminary injunction test is appropriate.

■ Under traditional principles of equity, a party is entitled to a preliminary injunction if it demonstrates that 1) it has a reasonable likelihood of prevailing on the merits, 2) it has no adequate remedy at law, 3) it will suffer irreparable harm if the preliminary injunction is not issued, 4) the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendants will suffer if the injunction is granted, and 5) the injunction will not harm the public interest. *See Roth, M.D. v. Lutheran General Hosp.*, 57 F.3d 1446, 1453 (7th

Cir.1995); *Storck UNITED STATES OF AMERICA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–14 (7th Cir.1994); *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1014–15 (7th Cir.1990).

■ If the plaintiff meets its burden of showing some likelihood of success on the merits and a lack of an adequate remedy at law and that it will suffer "irreparable harm" if preliminary relief is denied, then the district court engages a "sliding scale" analysis by balancing the harms to the parties and the public interest. *Roth*, 57 F.3d at 1453; *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992) (citations omitted); *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371 (7th Cir.1989) (emphasis in original). If the moving party cannot establish either of these prerequisites, a court's inquiry ends and the injunction must be denied. *Abbott Labs.*, 971 F.2d at 11. This sliding scale approach is properly characterized as "subjective and intuitive, one which permits district courts to 'weigh the competing considerations and mold appropriate relief.'" *Id.* at 12. A district court has broad discretion in deciding whether to grant a motion for injunctive relief. *Advent Elecs., Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir.1997).

■ "The purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988). "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor in order to get the injunction; the less likely he is to win, the more it need weigh in his favor." *Ping*, 870 F.2d at 1371–72 (citation omitted).

■ The plaintiff asserts that it is not required to show irreparable harm in this case because injunctive relief is being sought pursuant to a statutory provision. In such actions "where the plaintiff seeks an injunction to prevent the violation of a federal statute that specifically provides

for injunctive relief, it need not show irreparable harm." *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n,* 740 F.2d 566, 571 (7th Cir.1984). Because Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action. *United States v. Odessa Union Warehouse Co-op.,* 833 F.2d 172, 176 (9th Cir.1987).

■ Thus, in actions for statutory injunctions, once a violation of the act or regulation is shown, the moving party need show only that there is some reasonable likelihood of future violations. *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979). In *Commodity Futures,* the court noted that "when Congress has integrated traditional modes of equitable relief into a statutory enforcement scheme, the court's equitable power should be exercised in harmony with the overall objectives of the legislation." *Id.* at 1219 (citing *SEC v. Advance Growth Capital Corp.,* 470 F.2d 40, 53 [7th Cir.1972]).

Here, the plaintiff is bringing this action pursuant to 25 U.S.C. § 2710(d)(7)(A)(ii) which provides in relevant part:

The United States district courts shall have jurisdiction over—(ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–State compact ... that is in effect.

The plaintiff maintains this language is an express authorization of injunctive relief and, thus, the "statutory injunction" test should be applied in this case.

In *Illinois Bell,* cited by the plaintiff to support its position, the plaintiff sought a preliminary injunction pursuant to 47 U.S.C. § 401(b) to compel the Illinois Commerce Commission to comply with an order of the Federal Communications Commission (FCC) and to place into effect a rate increase for intrastate service. 740 F.2d at 571. Section 401 contains the enforcement provisions for the Federal Communications Act, 47 U.S.C. § 151 *et seq.,* which is a comprehensive scheme for regulation of interstate communications. *See Benanti v. United States,* 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957). Section 401(b) sets forth procedures for enforcement of orders of the FCC and provides that if a person fails to obey an order of the FCC, the FCC or any person injured thereby may apply to the appropriate district court for enforcement of the order. This section further provides:

If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process ....

47 U.S.C. § 401(b). The court in *Illinois Bell* held that where a plaintiff seeks an injunction to prevent the violation of a federal statute that specifically provides for injunctive relief, the plaintiff does not have to demonstrate irreparable harm because the statute requires the court to make a factual finding that the defendant had disobeyed a "regularly made and duly served" order before the injunction could be granted. *Illinois Bell,* 740 F.2d at 571.

In *United States v. Cappetto,* 502 F.2d 1351 (7th Cir.1974), also cited by the plaintiff, the government sought and obtained a preliminary injunction against an illegal gambling operation pursuant to 18 U.S.C. § 1964, the civil remedies provision of the racketeering statutes. Under the statute, then known as the Organized Crime Control Act of 1970, the government was explicitly provided with both civil and criminal remedies which could be used to prevent and restrain racketeering activity. *See* 18 U.S.C. §§ 1962, 1963, 1964. Section 1961(1) defines racketeering activities to include illegal gambling businesses prohibited by 18 U.S.C. § 1955. Section 1962 sets forth prohibited activities. Section 1964 states that the "district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders" and specifically sets

forth a list of remedies available to the court, including ordering divestiture of any interest in any enterprise, and dissolution or reorganization of any enterprise. 18 U.S.C. § 1964(a).

The defendants in *Cappetto* argued that the government should not prevail because it had not shown irreparable injury or inadequacy of the remedy at law. 502 F.2d at 1358. The court disagreed:

> It was plainly the intention of Congress in adopting Section 1964 to provide for injunctive relief against violations of Section 1962 without any requirement of a showing of irreparable injury other than that injury to the public which Congress found to be inherent in the conduct made unlawful by Section 1962. It is also obvious that Congress did not intend to require a showing of inadequacy of the remedy at law. If, as defendants contend, the existence of the criminal remedy at law under Section 1963 would defeat an action in equity under Section 1964, the latter section would be a nullity.

*Id.* at 1358–59.

The plaintiff also relies upon *Commodity Futures*, 591 F.2d at 1214. In that case, the Commodity Futures Trading Commission (Commission) brought an action pursuant to the Commodity Exchange Act against seven members of the Hunt family and an affiliated company claiming that the defendants had been exceeding the limit set for soybean futures contracts. The Commission sought preliminary and permanent injunctions pursuant to 7 U.S.C. § 13a–1 which specifically provides for actions to enjoin or restrain violations of the Commodity Exchange Act.

Under § 13a–1(a), the Commission is authorized to institute an action seeking injunctive relief whenever it appears that any person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter [7 U.S.C. §§ 1 *et seq.*] or any rule, regulation, or order thereunder." Section 13a–1(b) provides: "Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."

The court held that actions for statutory injunctions "need not meet the requirements for an injunction imposed by traditional equity jurisprudence." 591 F.2d at 1220. Rather, once a violation is demonstrated, the moving party only need show that there is some reasonable likelihood of future violations. *Id.*

Similarly, *In re National Credit Management Group, L.L.C.*, 21 F.Supp.2d 424 (D.N.J.1998), the Federal Trade Commission (FTC) and the State of New Jersey sought to enjoin violations of various statutes including the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(a). Section 45(a) of the FTCA states that unfair methods of competition or unfair or deceptive acts or practices in or affecting commerce are unlawful and § 45(b) sets forth proceedings for enforcement by the FTC. Under Section 53(a) of the FTCA, the FTC is specifically authorized to seek an injunction if it has "reason to believe" that the FTCA is being violated. 15 U.S.C. § 53(a). The statute further provides that "in proper cases, the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b)(2).

The court held that where an injunction is sought pursuant to a statutory provision, the moving party must establish that "probable cause exists to believe that the statute in question is being violated and there is some reasonable likelihood of future violations." 21 F.Supp.2d at 439–440 (quoting *United States v. Richlyn Labs., Inc.*, 827 F.Supp. 1145, 1150 [E.D.Pa. 1992]). In so concluding, the court stated that "because Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action." 21 F.Supp.2d at 439 [quoting *Richlyn Labs.*, 827 F.Supp. at 1150]. The court also stated that the passage of the FTCA, "in a sense, results in an implied finding that violations of this statutory enactment will

harm the public and should be restrained if necessary." *Id.*

Finally, in *United States v. Richlyn Labs.*, 827 F.Supp. 1145 (E.D.Pa.1992), the United States sought an injunction pursuant to 21 U.S.C. § 332 against a drug manufacturer who was violating the Food, Drug, and Cosmetic Act (FDCA). The FDCA sets out prohibited acts in § 331. Section 332, which provides for injunctive relief, states that the district courts shall have jurisdiction "for cause shown to restrain violations" of § 331, with three noted exceptions. 21 U.S.C. § 332.

The court held that, in addition to establishing probable cause to believe that the statute in question is being violated, the moving party must also demonstrate that there is some reasonable likelihood of future violations in order to be entitled to injunctive relief. *Richlyn Labs.*, 827 F.Supp. at 1150. The court also held that the defendants would be preliminarily enjoined from continuing their manufacturing, processing and distribution activities until they were in compliance with the applicable Food and Drug Administration regulations. *Id.* at 1152–1153.

■ After careful review of the case law and the statutes at issue in those cases, this court concludes that the use of the traditional test for issuance of a preliminary injunction is appropriate in this case. The statute in this case simply confers jurisdiction on the federal court in the event that a state *or* a tribe seeks to enjoin class III gaming. The statutes at issue in the cited cases involving statutory injunctions were part of an enforcement scheme and required some showing for the issuance of the injunction.

In *Illinois Bell*, for example, the statute required the court to make a factual finding that the defendant had failed to obey a "regularly made and duly served" order before the requested injunction could be granted. *Illinois Bell*, 740 F.2d at 571. The statute at issue in that case, 47 U.S.C. § 401(b), is part of a comprehensive scheme for regulation of interstate commu-

nications under the Federal Communications Act.

Similarly, the statute at issue in *Cappetto*, 18 U.S.C. § 1964, provides for injunctive relief to prevent and restrain violations of the criminal activities set forth in § 1962. Given the statutory scheme involved, the court concluded that it was "plainly" the intention of Congress in adopting § 1964 to provide for injunction relief for violations of § 1962 without requiring a showing of irreparable harm. *Cappetto*, 502 F.2d at 1358–59.

Unlike the statutes in the cited cases, 25 U.S.C. § 2710(d)(7)(A)(ii) is not part of a general enforcement scheme. Therefore, this court cannot "plainly" infer that Congress intended to provide for injunctive relief without requiring a showing of irreparable injury. *See Cappetto*, 502 F.2d at 1358–59.

Moreover, the statute at issue in this case does not place any sort of evidentiary burden on the moving party. Therefore, it is unlike the statutes at issue in *Illinois Bell, Commodity Futures Trading Com'n., National Credit Management*, and *Richlyn Labs.*, which specifically require that the moving party make some type of showing that the federal statute has been violated before an injunction may issue. Thus, this court concludes that utilization of the "statutory injunction" test is not appropriate and that the traditional preliminary injunction test will govern the plaintiff's motion for preliminary injunctive relief.

The plaintiff asserts that it has a reasonable likelihood of success on the merits. In addressing this issue, the court will need to analyze the merits of the plaintiff's claim that the Tribe is operating Class III electronic games of chance at Pine Hills Golf and Supper Club in violation of IGRA. The following findings of fact are relevant to the disposition of the plaintiff's motion for a preliminary injunction. The court's findings of fact are based upon the stipulated facts and the proposed findings of fact submitted by the parties. To the

extent that the proposed findings are undisputed or are consistent with testimony and evidence, they have been adopted by the court.

### Findings of Fact [1]

The plaintiff, State of Wisconsin (Wisconsin), is a sovereign state of the United States. The defendant, Stockbridge–Munsee Community (Tribe) is a sovereign federally-recognized Indian tribe with a reservation located in Shawano County, Wisconsin. Defendant Robert Chicks is president of the Stockbridge–Munsee community whose duties include presiding over the affairs of the Tribe. The events giving rise to the claim asserted in this action have occurred, and continue to occur, in this judicial district.

The Stockbridge–Munsee Indians are descendants of the Mohicans who initially had occupied a large territory in the upper Hudson River Valley. In the 1730s, members of the Tribe had moved east and settled along the Housatonic River in what is now Stockbridge, Massachusetts. *See* Patrick Frazier, *The Mohicans of Stockbridge*, at 12 (1992). A Christian mission was established at Stockbridge and in 1739, the legislature incorporated the Indian town under the name of Stockbridge. *Id.* at 13–18, 47–48. The Tribe's identification as Stockbridge Indians derives from this settlement.

The Stockbridge Indians were active allies of the American Revolutionaries. *Id.* at 197–198, 21. However, increasingly settlers were populating the town. *Id.* at 237–240. Following the Revolutionary War, as a result of efforts of members of the Oneidas, the Mohicans were awarded land in New York and migrated to New York from western Massachusetts. *Id.* at 238, 244. Subsequently, in about 1821, the Tribe moved to Wisconsin. (Exh. 329 at 9).

At this time, the federal government was engaged in a policy of removal. The objective was to remove Indian tribes to lands in the West beyond the boundaries of white settlement in exchange for their territory in the eastern United States. *See* Felix S. Cohen, *Handbook of Federal Indian Law* at 28, 78 (1982 ed.).

In a treaty with the Menominee Tribe [2] and the United States, which was ratified in 1832, the Stockbridge–Munsee tribe was given a reservation of forty six thousand and eighty acres of land on the eastern shore of Lake Winnebago. (*See* "Treaty with the Menominee, 1832," 7 Stat. 405, Exh. 1, Art. 1). In a 1839 treaty with the United States, the Stockbridge–Munsee tribe ceded and relinquished the east half of the tract containing twenty-three thousand and forty acres of land to the United States in exchange for monetary compensation and other benefits. (Exh. 1, Arts.2, 6).

By Act of Congress in 1843, the United States granted citizenship to members of the Tribe and provided for the partition and division of the lands. At this time and through most of the nineteenth century, the prevailing view was that tribal affiliation was inconsistent with acquisition of United States and state citizenship as a matter of policy. Cohen at 639–642. The acquisition of citizenship was conditioned upon the severing of tribal ties. *Id.* at 643.

In the 1843 Act, Congress provided that the twenty-three thousand and forty acres on the east side of Lake Winnebago which had been reserved for the Stockbridge–Munsee tribe could be partitioned and divided among the members of the tribe and

---

**1.** The findings of fact are taken from the joint stipulation of facts filed by the parties, the parties' proposed findings of fact, the testimony and evidence admitted at the hearing and documents submitted by the parties in support of their respective positions on the plaintiff's motion for preliminary injunction.

**2.** The treaties and other historical documents cited in this decision vary in their spelling of the name of the Menominee Tribe. *See e.g.,* Treaty of 1839 ("Menominee") and Treaty of 1848 ("Menomonee"). The court will use "Menonimee," which is the currently used spelling of the Tribe's name, except when it is specifically quoting a document.

held by them, separately and severally, in fee simple. ("An Act for the relief of the Stockbridge tribe of Indians in the Territory of Wisconsin," 5 Stat. 645; Exh. 2, § 1). The Act further provided that a board of commissioners would be established for the purpose of making partition and division of these lands, and that upon completion of the commissioners' report, the President would cause patents to be issued to the several individuals named in the report with the land to be held in fee simple by the individuals, their heirs and assigns. (Exh. 2, §§ 2 & 6). The Act also stated that after the report was filed and transmitted to the president, the Stockbridge–Munsee tribe, "and each and every of them, shall then be deemed to be, and from that time forth are hereby declared to be, citizens of the United States." (Exh. 2, § 7). The Act further stated that the jurisdiction of the United States shall extend over the "township or reservation" now held by the tribe and that the tribe's rights as a tribe or nation shall cease. (Exh. 2, § 7).

The Tribe at this time basically was divided into two opposing camps: the Citizen party and the Indian party. The Citizen party favored relinquishing tribal status in return for United States citizenship and receipt of individual parcels of tribal land in fee simple. The Indian party wanted to preserve the tribal status and culture. This factional conflict impacted on the Tribe's dealings with the United States.

In 1846, Congress repealed the 1843 Act and restored and re-established the Tribe's rights and privileges as though the 1843 Act had never been passed. (9 Stat. 55; Exh. 3, § 1). The Act provided for the enrollment of Stockbridge–Munsee tribal members who desired citizenship and further provided that the tribal land be divided into two districts, the Indian District and the Citizen District based on the numbers in these respective parties. (Exh. 3, § 2). The lands in the Indian District were to be held in common, while those in the Citizen District were to be divided and allotted to each Indian who became a citizen. (Exh. 3, § 3).[3] Upon completion of the division and allotment, patents would be issued and a title in fee simple to the lot of land would vest in the patentee. (Exh. 3, § 2). The Act further provided that Indians who became citizens would forfeit all rights to receive any portion of the annuity which may at the time or in the future be due the Tribe. (Exh. 3, § 2).

In the Treaty in November 24, 1848, between the United States and the Tribe, the Tribe renounced all participation in the benefits or privileges granted or conferred by the Act of 1843 and acknowledged and declared themselves to be under "the protection and guardianship of the United States, as other Indian tribes." ("Treaty with the Stockbridge Tribe, 1848," 9 Stat. 955; Exh. 4, Art. I). The Tribe agreed to "sell and relinquish" to the United States the township of land on the east side of Lake Winnebago. (Exh. 4, Art. III). In consideration of the cessation and relinquishment, the United States agreed to pay the tribe a sum of money. (Exh. 4, Art. V). It was agreed that the Stockbridge tribe could remain upon the lands for one year after the ratification of the agreement and that they would "remove to the country set apart for them, or such other west of the Mississippi River as they may be able to secure." (Exh. 4, Art. VII). The treaty also provided for the allotment of lands to tribal members who

---

**3.** Allotment is a term of art in Indian law which refers to the distribution to individual Indians of property rights to specific parcels of reservation. *Yankton Sioux Tribe v. Gaffey,* 188 F.3d 1010 (8th Cir.1999) (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 142, 92 S.Ct. 1456, 31 L.Ed.2d 741 [1972]). "Indian allotment" refers to land owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation. Cohen, *Handbook of Federal Indian Law,* at 40. Allotment describes either a parcel of land owned by the United States in trust for an Indian ("trust" allotment) or owned by an Indian subject to a restriction on alienation in favor of the United States. ("restricted fee" allotment). *Id.* at 615–616.

had become citizens of the United States with patents to be issued to them by the federal government. (Exh. 4, Art. IV).

However, a majority of the Tribe did not want to relocate but preferred a new location in Wisconsin. Other tribal members desired to sever their tribal relations and to receive patents for the lots of land which they occupied. Therefore, in 1856, the United States again attempted to resolve the intra-tribal conflict between the Citizen party and the Indian party.

The United States and the Tribe negotiated a treaty that established a reservation comprising two townships in Shawano County. Actually, two treaties lead to the establishment of the Stockbridge–Munsee tribe's 1856 reservation. On February 5, 1856, the Tribe and the United States entered into a treaty which provided that the Tribe be given "a tract of land in the State of Wisconsin, near the southern boundary of the Menomonee reservation, of sufficient extent to provide for each head of a family and others lots of land of eighty and forty acres." ("Treaty with the Stockbridge and Munsee, 1856," 11 Stat. 663; Exh. 5, Art. 2). In return, the tribe agreed to "cede and relinquish to the United States" all their remaining right and title in lands in the town of Stockbridge, Wisconsin, and lands in Minnesota set aside for them by the amendment to the 1848 treaty. (Exh. 5, Art. 1).

The preamble of the treaty recounted the lengthy history of dealings between the Tribe and the United States and the internal problems and conflicts within the Tribe. (Exh. 5, ¶¶ 1–6). The treaty acknowledged that a majority of the Stockbridge and Munsee tribe were adverse to removing to Minnesota and preferred a new location in Wisconsin "to resume agricultural pursuits and gradually to prepare for citizenship." (Exh. 5, ¶ 7). It was also recognized, however, that a number of other tribal members desired to sever their tribal relations and to receive patents for the lots of land which they occupied at the time. (Exh. 5, ¶ 7). The final paragraph stated:

Whereas the United States are willing to exercise the same liberal policy as heretofore, and for the purpose of relieving these Indians from the complicated difficulties, by which they are surrounded, and to establish comfortably together all such Stockbridges and Munsees—wherever they may be now located, in Wisconsin, in the State of New York, or west of the Mississippi—as were included in the treaty of September third, one thousand eight hundred and thirty nine, and desire to remain for the present under the paternal care of the United States Government; and for the purpose of enabling such individuals of said tribes as are now qualified and desirous to manage their own affairs, to exercise the rights and to perform the duties of the citizen, these articles of agreement have been entered into.

(Exh. 5, ¶ 8)

The 1856 treaty provided that, after the lands set aside for the tribe were selected, the United States would have the lands surveyed and allotted "among the individuals and families of their tribe." (Exh. 5, Art. 3). The treaty further provided that each head of a family was entitled to eighty acres of land and if the family consisted of more than four members and if thought expedient by the council of the Stockbridges and Munsees, an additional eighty acres could be allotted to him or her. (Exh. 5, Art. 3). Each single male person above eighteen years of age was entitled to eighty acres and each female person above age eighteen "not belonging to any family," and any orphan child was entitled to forty acres and "sufficient land shall be reserved for the rising generation." (Exh. 5, Art. 3).

The treaty further provided that after the allotments were made, the persons entitled to the land could take immediate possession and certificates would be issued guaranteeing and securing their possession and an ultimate title to the land. (Exh. 5, Art. 3). The treaty stated that such certificates would not be assignable and would

contain a clause expressly prohibiting the sale or transfer of the land by the holder. (Exh. 5, Art. 3). Under the treaty, the United States would hold the land in trust for ten years for the holders of the land. (Exh. 5, Art. 3). After ten years, with the consent of the Stockbridge and Munsee council, patents for the land would be issued. (Exh. 5, Art. 3). The purpose of the treaty was to "advance the welfare and improvement" of the tribe and to that end, the treaty provided that the president, with the advice and consent of the Senate, may "adopt such policy in the management of their affairs," as in his judgment may be most beneficial to the Stockbridge–Munsee Indians, "or Congress may, hereafter, make such provision by law, as experience shall prove to be necessary." (Exh. 5, Art. 11).

On February 11, 1856, the Menomonee Indian Tribe and the United States entered into a treaty whereby the Menomonee Tribe ceded and relinquished to the United States a tract of land, "not to exceed two townships in extent," for the purpose "of locating thereon the Stockbridge and Munsee Indians, and such others of the New York Indians as the United States may desire to remove to the said location within two years from the ratification hereof." ("Treaty Between the United States and the Menominee Tribe [1856]," 11 Stat 679; Exh. 6, Art. 1).

Two townships, which were formerly part of the Menominee Reservation, were purchased from the Menominee Tribe by the United States for purposes of establishing a reservation for the Stockbridge–Munsee Tribe. A township contains 36 sections, each of which is one mile square. Thus, the 1856 reservation contained a total of 72 sections. The two townships reserved as the Stockbridge–Munsee Reservation, now known as the towns of Bartelme and Red Springs, are located on Ranges 13 and 14 East, Township 28 North, Shawano County, Wisconsin. (Exh. 102).

The new reservation with its "cold and barren sand hills" proved unfit for agriculture. (Appendix to Defendants' Brief in Opposition to Motion for Preliminary Injunction [Defendants' Appendix] at 224). In an annual report for the United States Indian Agency in Green Bay, Wisconsin, dated September 23, 1866, it was reported that approximately 152 tribal members currently resided on the reservation and that because of the "forbidding character of their country," they could not realize a meager subsistence without occasional supplies from the government. *Id.* The report noted that these circumstances "bred discontent" among tribal members who desired "a remodelling of their stipulations." *Id.*

In a letter to Congress signed by John Hendricks, sachem, and eighty-three others dated January 6, 1863, members of the Tribe expressed their dissatisfaction with the poor quality of the land and their belief that the land provided for them as a result of the 1856 treaty was not the one promised "nor the one for which the treaty was signed." (Defendants' Appendix at 229). The tribal members stated that the soil was sand and the location too far north to allow adequate time for crops to mature. They noted that the presence and type of timber on the land "would do for a lumbering community but not for us, who are just emerging from the Indian state, to become an agricultural people." *Id.*

Factional conflict continued to mark intra-tribal relations in the years following the signing of the treaty. In addition, the state's lumber industry became interested in the reservation's timber lands. Legal harvesting of timber occurred pursuant to Office of Indian Affairs (OIA) contracts to harvest timber in "burnt over" reservation lands. The lumber interests were desirous of gaining access to more of the Tribe's timber resources.

In 1868, a treaty between the Tribe and the United States was drafted. (Draft Treaty of 1868, Exh. 7). By its express language, the tribe was to "cede and relinquish to the United States" all title and interest held by the tribe, individually or

collectively, in 54 sections. (Exh. 7, Art. 1). The Secretary of the Interior questioned the impact of the treaty on the "citizen party of the Indians." (Exh. 116, App. 14 at 1). He concluded that the treaty should not be made and it ended there. (Exh. 116, App. 14 at 1).

On February 6, 1871, Congress passed "an Act for the Relief of the Stockbridge and Munsee Tribe of Indians in the State of Wisconsin." (16 Stats. 404; Exh. 8).[4] The legislative history surrounding passage of the Act is limited. The Act provided that "the two townships of land, situated in the county of Shawana, and State of Wisconsin, set apart for the use of the Stockbridge and Munsee tribe of Indians" shall be advertised for sale and shall be offered at public auction to the highest bidder but not for less than the appraised value in lots not exceeding eighty acres each, except for eighteen contiguous sections of land. (Exh. 8, §§ 1–2). The Act authorized the Secretary of the Interior to reserve from sale lands "not exceeding eighteen contiguous sections, embracing such as are now actually occupied and improved, and are best adapted to agricultural purposes, subject to allotment to members of the Indian party of said tribe." (Exh. 8, § 2). The Act further provided that all of the lands remaining unsold after one year were to be again advertised and offered at public auction at not less then the minimum of one dollar and twenty-five cents per acre. (Exh. 8, § 2).

The Act required that, immediately after the General Land Office received returns of the last public sale, a statement was to be made up under the direction of the Secretary of the Interior, showing the gross amount realized from the sale of the two townships after appropriate deductions were made and an amount added for the value of the lands remaining unsold in the two townships, estimated to be 60 cents per acre. (Exh. 8, § 4). Also to be included in this statement was the sum of six thousand dollars held in trust by the United States for use of the Stockbridge and Munsee tribes under the treaty of 1839. (Exh. 8, § 4). The Act stated that "the total amount thereof shall constitute the entire sum of money due from the Government of the United States to the said Stockbridge and Munsee tribes of Indians, to be paid and appropriated for their benefit." (Exh. 8, § 4).

The proceeds from the sale were to be divided between the Citizen and Indian parties of the tribe in proportion to the number of each and the portion of the proceeds belonging to the Citizen party was to be divided equally among them per capita and paid out to the heads of families and adult members of that party. (Exh. 8, § 5). The sum belonging to the Indian party was to be credited to it "on the books of the treasurer of the United States," and the interest applied to the support of schools, the purchase of agricultural implements or paid in such other manner as the president may direct. (Exh. 8, § 5). However, part of the proceeds due the Indian party could, on request of the leaders of the tribe, be used for "securing a new location for said tribe." (Exh. 8, § 5).

The Act provided for the preparation of two rolls, one to be denominated the Indian roll and the other to be denominated the Citizen roll, for the "purpose of determining the persons who are members of said tribes and the future relation of each to the government of the United States." (Exh. 8, § 6). The Citizen roll would "embrace the names of all such persons of full age, and their families, as signify their desire to separate their relations with said tribe, and to become citizens of the United States." (Exh. 8, § 6). After the payment of proceeds to members of the Citizen party, there was to be "a full surrender and relinquishment" of all their claims as members of the tribe and they would be admitted to "all the rights and privileges of

---

4. In 1871, Congress ended treaty making with Indian tribes. *See* Cohen at 643 (citing Appropriations Act of March 3, 1871, ch. 120, 15 Stat. 544, 566 [codified at 25 U.S.C. § 71]).

citizens of the United States." (Exh. 8, § 6).

The Indian roll would contain the names of all persons of full age and their families as desire "to retain their tribal character and continue under the care and guardianship of the United States." (Exh. 8, § 6). After the rolls had been made and returned, the Indian party would be known as the "Stockbridge tribe of Indians" and "may be located upon lands reserved" from sale or "such other reservation as may be procured for them, with the assent of the council of said tribe." (Exh. 8, § 7).

The Act further provided that after a suitable and permanent reservation had been obtained and accepted by the tribe, "either at their present home or elsewhere," it was to be surveyed and subdivided under the direction of the Secretary of the Interior, and a "just and fair allotment" made by the council of the tribe "among the individuals and families composing said tribe." (Exh. 8, § 8). The Act specified the amount of land to be provided to adult tribal members and further provided that if a member of the tribe died without heirs capable of inheriting, "the land shall revert to and become the common property of said tribe." (Exh. 8, § 8).

A certified copy of the allotments made was to be returned to the commissioner of Indian affairs within one year after the reservation was made and accepted by the tribe, and thereafter the title of the lands "shall be held by the United States in trust for individuals and their heirs to whom the same were allotted." (Exh. 8, § 9).

On January 8, 1872, an auction was held in Menasha, Wisconsin as called for under the Act. (Exh. 116, p. 52). Various tracts of land in the 54 sections were sold, though much of the land remained unsold. (Exh. 116, p. 53). One year later, the land was opened for cash entry at $1.25 per acre. (Exh. 116, p. 53).

In 1874, per section 4 of the Act, Congress appropriated $7,081.80 for the remaining 11,803 acres that remained unsold after the auction and cash entry. (Exh. 141). Three-fourths of the land within the 1856 reservation was sold pursuant to the Act of 1871, with a portion of the proceeds going to members of the Citizen party, who were to relinquish their tribal membership.

In the years following passage of the 1871 Act, rival petitions from members of the Indian party and Citizen party were submitted to Congress. As a result, in the late 1880's Congress began to consider new legislation to resolve the problems. (Transcript of Preliminary Injunction Hearing, October 27, 28, and 30, 1998[Tr.] 69–70, 100).

In 1893, Congress passed "An act for the relief of the Stockbridge and Munsee tribe of Indians in the State of Wisconsin." (27 Stat. 744; Exh. 9). The preamble to the Act acknowledged the 1856 treaty in which the Tribe ceded certain lands and in return accepted certain lands as a reservation "upon which they have ever since resided." (Exh. 9, ¶ 1). The Act acknowledged that government officials interpreted the 1871 Act as excluding certain Indians from participating in tribal funds and from the right to occupy the reservation. (Exh. 9, ¶ 2).

The Act provided that all members of the Tribe at the time of the 1856 treaty and their descendants and all persons who became members of the Tribe under the treaty's provisions and their descendants were deemed to be members of the Tribe and entitled to their pro-rata share in tribal funds and in the occupancy of the lands. (Exh. 9, § 1). The Act declared that all members who had possessed land under the allotments of 1856 and 1871 and who had themselves or whose heirs had resided on the lands since that time were owners of such lands in fee simple and the government was to issue patents to them. (Exh. 9, § 1). The Act directed the Secretary of the Interior to cause an enrollment to be taken and filed. (Exh. 9, § 2). Finally, the Act provided that in all cases where the allotments of 1871 conflict with allotments of 1856, "the latter shall prevail." (Exh. 9, § 2).

In the aftermath of the Act of 1893, tribal membership had increased to more than 500 and there was not enough land for all tribal members to receive their proper allotment under the terms of the Treaty of 1856. (Tr. 275; Exh. 116, App. 31 at 7). In 1900, the Commissioner of Indian Affairs instructed Inspector Cyrus Beede to meet with the Tribe to solve the "small-shoe-large foot" problem, namely the small quantity of land owned by the Tribe and the number of Indians entitled to allotments. (Exh. 116, Appendix 31 at 11).

The plan submitted by Inspector Beede and approved by a majority of tribal members contemplated a "full and complete settlement of all obligations of the Government," provided the government met the conditions set out in the plan. (Exh. 116, Appendix 31 at 16). The plan provided that the government could purchase land elsewhere to make the allotments since there was insufficient land on the reservation to give each person the designated allotment. (Exh. 116, Appendix 31 at 17). One of the conditions was that funds to provide lands for all members of the tribe or to pay tribal members who chose money in lieu of land would be paid by the United States rather than drawn from the Tribe's own trust funds. (Exh. 116, Appendix 31 at 17).

In 1906, Congress passed legislation based largely on the plan negotiated by Inspector Beede in 1900, providing allotments in fee simple for the Stockbridge-Munsee Indians. (34 Stat. 382; Exh. 10). The 1906 Act provided that the members of the Tribe who had not up to then received patents for land in their own right would receive allotments of land and patents for the land in fee simple. (Exh. 10, ¶ 1). Those individuals who did not get an allotment because there was not sufficient land within the reservation could receive allotments from other lands or receive $2.00 per acre in lieu of receiving an allotment. (Exh. 10, ¶¶ 5–6). The Act provided that it was obligatory for tribal members who had made a selection of land within the reservation "to accept such selection as an allotment." (Exh. 10, ¶ 6).

One of the conditions set out in the plan proposed by Inspector Beede was not included in the Act. The Act provided that the funds to carry out the provisions of the Act were to be paid from the Tribe's consolidated trust fund in the United States treasury, rather than paid by the United States. (Exh. 10, ¶ 10).

The allotments were approved by the Secretary of the Interior in January 1910. *See United States v. Gardner*, 189 F. 690, 693 (E.D.Wis.1911); The patents for these allotments were delivered on April 4,1910. *Id.*

In 1934, Congress passed the Indian Reorganization Act (IRA), 25 U.S.C. § 461, *et seq.*, which authorized the Secretary of the Interior to expand the land bases of the Indian tribes and to proclaim new reservations. Pursuant to this authority, the United States subsequently purchased approximately 1,050 acres of land within the 1856 reservation boundaries. On March 19, 1937, pursuant to the provisions of the Act, the Acting Secretary of the Interior issued a proclamation stating that the described lands "are hereby proclaimed to be an Indian reservation." *See* Plaintiff's Appendix at 132.

Article II of the Constitution and By-laws of the Stockbridge Munsee Community approved on November 18, 1937, defines the Tribe's jurisdiction as follows: "The jurisdiction of the Stockbridge Munsee Community shall extend to all lands purchased, heretofore or hereafter, by the United States for the benefit of said Community." (Plaintiff's Appendix at 163–169).

In December 7, 1948, the Secretary of the Interior proclaimed that an additional 1,200 acres that had been acquired for the benefit of the Tribe were "hereby added to and made a part of the existing reservation established March 19, 1937." (Plaintiffs Appendix at 133).

In 1972, Congress declared that approximately 13,000 acres of submarginal land also contained within the 1856 reservation boundaries would be held in trust by the United States for the benefit of the Tribe, and would be part of the reservation. *See* Public Law 92–480, 86 Stat. 795.

In 1992, pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 *et seq.*, the State of Wisconsin and the Stockbridge–Munsee Community entered into the Stockbridge–Munsee Community and State of Wisconsin Gaming Compact of 1992 ("compact") for the conduct of Class III gaming as required by 25 U.S.C. § 2710(d)(1)(C). Class III gaming is defined by the Indian Gaming Regulatory Act, 25 U.S.C. § 2703(8), to include electronic games of chance such as slot machines.

The compact authorizes the Tribe to operate certain Class III electronic games of chance, including slot machines, but only when such machines meet rigorous technical specifications and only under specific terms outlined in the compact. The compact's terms limit the operation of electronic games of chance to locations "on tribally-owned land or land held in trust by the United States on behalf of the Tribe, but only on such lands within the exterior boundaries of the tribal reservation." (Compact, Section XV, Part H). Pursuant to the compact, since 1992, the Tribe has operated Class III electronic games of chance at its North Star Casino and Bingo (North Star) located within the exterior boundaries of the Tribe's reservation, at W12180A County Road A, Bowler, Wisconsin.

In 1993, the Tribe purchased property known as the Pine Hills Golf and Supper Club, located at N9498 Big Lake Road, in the Town of Red Springs, Shawano County, Wisconsin (Pine Hills). This property lies within Section 2 of the Township of Red Springs.

Pine Hills lies within the boundaries of the reservation established by the Treaty between the Tribe and the United States in 1856. Pine Hills does not lie within the 18 sections reserved from sale pursuant to the Act of 1871. Pine Hills does not lie within any of the lands proclaimed to be reservation pursuant to the 1937 and 1948 proclamations; nor does it lie within the approximately 13,000 acres of submarginal land made part of the reservation pursuant to the 1972 Act.

In December 1995, the Tribe conveyed Pine Hills to the United States of America, to be held in trust for the benefit of the Tribe pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 465. By virtue of its status as trust land, Pine Hills constitutes "Indian lands" as defined by IGRA, 25 U.S.C. § 2703(4)(B).

Under the compact, operation of Class III electronic games of chance is only permitted on Indian lands that are also located within the boundaries of the Tribe's reservation. The Tribe has provided notice to the State, pursuant to the provisions of the compact, that it has moved a total of 168 slot machines from its casino in Bowler, Wisconsin to the Pine Hills location. The governor of Wisconsin has not consented to the operation of Class III games at Pine Hills.

In August 1998, the State of Wisconsin and the Tribe entered a written agreement amending the original compact. The amendments modified the original compact in certain respects, including extending it for five years, but did not modify the prohibition against operating electronic games of chance on lands outside the exterior boundaries of the reservation.

On August 28, 1998, the Tribe began operating Class III electronic games of chance at Pine Hills, namely slot machines. As of August 31, 1998, approximately 166 slot machines were in operation at Pine Hills. As of the date of the hearing, the gaming operation consisted of 170 slot machines. (Tr. 538). Approximately 700–800 slot machines are in operation at the North Star casino. (Tr. 538).

As of October 30, 1998, the Pine Hills gaming facility employed 40 individuals

and another ten individual had been hired and were scheduled to being working in the near future. (Tr. 535). Approximately 500 people are ·employed at the North Star gaming facility. (Tr. 529). The Tribe provides jobs to tribal members and non-tribal members. (Tr. 530). The largest proportion of jobs is for non-tribal members. (Tr. 530). The Tribe pays unskilled entry-level employee over $7.00 per hour, plus health insurance and other fringe benefits. (Exh. 502, Robert Chicks Dep., Exh. 1 ¶ 3).

In its business projections, the Tribe projected net revenues at Pine Hills of $8,500 per day for the months of April through September, and $5,100 per day from October through March. (Exh. 502, Robert Chicks Dep. Exh. 1, para. 7).[5] From August 28, 1998, through October 22, 1998, the Pine Hills casino had a total net revenue of $118,679.20, or an average of $2,119.27 per day of operations. (Exh. 415). During the same 56–day period, the North Star Casino had total net revenues of $6,528,942.24, or an average daily net revenue of $116,588.25 per day of operations. (Exh. 416).

On approximately October 1, 1998, the Tribe planned to commence a new marketing program for the Pine Hills casino. The Tribe has only partially begun that marketing program. (Tr. 542). Since October 2, 1998, the daily net revenues at the Pine Hills Casino have averaged about $4,400.00 per day. (Tr. 542).

The State of Wisconsin Division of Gaming issued a notice of violation to the Tribe relating to the Class III gaming operations at the Pine Hills casino. Aside from the dispute about whether nor not the Pine Hills casino is located on the Tribe's reservation, that notice sets forth certain alleged problems with compliance with state gaming regulations at the new casino. (Exh, 502 at 53–55).

## ANALYSIS

The plaintiff seeks a preliminary injunction enjoining the defendants from continuing the Class III gaming activities at the Pine Hills Golf Course and Supper Club (Pine Hills), the Tribe's newly-expanded gaming operation in the Town of Red Springs, Wisconsin pending final resolution of this action. The issue presented is whether Pine Hills is located within the exterior boundaries of the Stockbridge–Munsee reservation.

In seeking a preliminary injunction, the plaintiff asserts that the original reservation established in 1856 was subsequently diminished and ultimately dissolved by federal legislation enacted in 1871 and 1906, before being recreated on lands purchased for the Tribe pursuant to the Indian Reorganization Act of 1934(IRA). The state asserts that the present reservation does not include the Pine Hills property and, therefore, Pine Hills is an illegal gambling enterprise which violates the Tribe's gaming compact and the Indian Gaming Regulatory Act (IGRA).

In opposing the preliminary injunction motion, the defendants contend that the plaintiff has failed to meet the threshold showing of irreparable harm or a likelihood of success on the merits. They also assert that the "balancing of harms" weighs in their favor. The defendants state that the reservation boundaries established by the Treaty of 1856 have not been diminished, asserting an absence of substantial and compelling evidence of congressional intent to diminish the Tribe's reservation. They argue that the focus in diminishment analysis is appropriately on congressional intent primarily expressed in the language of the legislation allegedly effecting diminishment and only secondarily in the legislative history and other cir-

---

**5.** The term "net revenue," as applied to the Tribe's Class III gaming operations, refers to slot machine revenue minus the pay out of jackpots and promotional costs; it is not the Tribe's net profit from slot machine opera-

tions. More specifically, "net revenue" differs from net profits in that it does not account for costs like employee wages, utilities, and other costs of operating the casinos. (Tr. 539–540).

**1006**

cumstances surrounding the legislation at issue.

The plaintiff contends that it has a likelihood of success on the merits. To resolve this question, the court must determine whether the boundaries of the Stockbridge–Munsee reservation as defined by the Treaty of 1856 were diminished by the Act of 1871, "an Act for the Relief of the Stockbridge and Munsee Tribe of Indians in the State of Wisconsin".[6]

A brief summary of the changing relationship between the federal government and Indian tribes in the 19th and early 20th century provides background for the resolution of the issue before this court. In the 19th century, the federal government engaged in a policy of removing the Indians to lands in the West beyond the boundaries of white settlement in exchange for their territory in the eastern United States. *See* Cohen at 28, 78. This removal policy was formally established by the Act of May 28, 1830. Cohen at 122, n. 470 (citing 4 Stat. 411). "Removal and concentration were perceived as a method for the civilization and ultimate assimilation of the Indian into American life." *Id.* at 123.

Prior to the 1850's, federal policy generally supported the rights of Indian tribes to maintain communal or tribal ownership of land and their related social and political institutions. Cohen at 613. Occasionally, tribal lands were allotted to individual Indians or families. *Id.* In 1853, the federal government adopted a policy of allotment by which tribal ownership in some lands would be converted into title held by individual tribal members. *Id.* at 98. During this time, clauses were included in numerous treaties authorizing allotments. *Id.* at 130. In some cases, allottees surrendered their interests in the tribal estate and became United States citizens subject to state and federal jurisdiction. Cohen at 130, n.26 (citing treaties including the No-

vember 24, 1848, Treaty with the Stockbridges). The underlying rationale for this policy was the belief that the Indians should be assimilated into the "mainstream of American life." *See* Cohen at 128–129.

In the Appropriations Act of March 3, 1871, Congress provided for the termination of treaty making with Indian tribes. Cohen at 127; 16 Stat. 544 (codified at 25 U.S.C. § 71). However, the federal-Indian relationship continued much as it had before, except that negotiations with tribes about land cessions resulted in "agreements," rather than treaties. Cohen at 127. After passage of the Act, the federal government began to regulate the affairs of the tribes by statute or through contractual agreements ratified by statute, and tribes were no longer regarded as sovereign nations. *DeCoteau v. District County Court for Tenth Judicial District,* 420 U.S. 425, 431, 95 S.Ct. 1082, 43 L.Ed.2d 300, (1975) (citing Act of Mar. 3, 1871, c. 120, § 1, 16 Stat. 566).

Towards the end of the 19th century, Congress increasingly held the view that Indian tribes should "abandon their nomadic lives on the communal reservations and settle into an agrarian economy on privately-owned parcels of land." *Solem v. Bartlett,* 465 U.S. 463, 466, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). This shift in viewpoint was based in part on the belief that farming on individual plots of land would hasten the assimilation of Indians, and in part by the continuing demands for new lands for homesteaders who were moving west. *Id.*

In 1887, the General Allotment Act, 24 Stat. 388, commonly known as the Dawes Act,[7] was enacted by Congress in an attempt to "reconcile the Government's responsibility for the Indian's welfare with the desire of non-Indians to settle upon reservation lands." *DeCoteau,* 420 U.S. at 432, 95 S.Ct. 1082 (citing Act of Feb. 8,

**6.** The parties agree that the Pine Hills Golf and Supper Club at issue in this case lies within the boundaries of the reservation established by the Treaty of 1856 but does not

lie within the 18 sections reserved from sale pursuant to the Act of 1871.

**7.** Senator Dawes was the sponsor of the bill.

1887, c. 119, 24 Stat. 388). The Act gave the President the discretion to make allotments of portions of reservation lands to reservation Indians and, with tribal consent, to open up the remaining holdings to non-Indian settlement. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 118 S.Ct. 789, 794, 139 L.Ed.2d 773 (1998); *DeCoteau*, 420 U.S. at 432, 95 S.Ct. 1082 (citing *Mattz v. Arnett*, 412 U.S. 481, 496, 93 S.Ct. 2245, 37 L.Ed.2d 92 [1973] ).

The policy of the Act "was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing." *Mattz v. Arnett*, 412 U.S. 481, 496, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). The Act provided for the mandatory allotment of reservation lands. Cohen at 613. It was believed that within a generation or two, the reservations would disappear, the tribes would dissolve and individual Indians would be absorbed into the larger white community. *Yankton Sioux Tribe*, 118 S.Ct. at 794 (citing Hearings on H.R. 7902 before the House Committee on Indian Affairs, 73rd Cong., 2d Sess., 428 [1934] [statement of D.S. Otis on the history of the allotment policy] ).

As a corollary to the allotment policy, the federal government sought the cession of tribal lands which remained after each eligible Indian had received an allotment. Cohen at 613. These surplus lands were open to purchase or homesteading by non-Indians. *Id.*

By the 1920's, however, the allotment policy was generally deemed to be a failure. *Id.* at 614. Rather than benefitting the Indians, the policy had often resulted in the loss of Indian lands. *Id.*

The late 1920's and early 1930's marked a change in the federal government's Indian policy and a departure from many of the assimilationist policies of the allotment era. *Id.* at 144. There was more tolerance for many traditional aspects of Indian culture and new protections were provided for some Indian rights. *Id.*

In 1934, Congress passed the Indian Reorganization Act (IRA) which was designed to encourage economic development and tribal self-government and to end the alienation of tribal land needed to support tribal members. *Id.* at 144–149. In addition, the IRA's purpose was to provide for the acquisition of additional tribal lands and generally to improve the economic situation of Indians. *Id.*

In determining whether the 1856 boundaries of the Stockbridge–Munsee reservation were diminished by subsequent acts of Congress, the court is guided by well-established legal principles. "[I]t is settled law that some surplus land acts diminished reservations ... and other surplus land acts did not." *Solem*, 465 U.S. at 469, 104 S.Ct. 1161 (citations omitted). The effect of any given surplus land act depends upon the language of the act itself and the underlying circumstances of its passage. *Id.* In *Solem*, the court recognized that the surplus land acts seldom stated whether opened lands retained reservation status because such distinction seemed unimportant at the time since Indians lands were judicially defined to include only those lands in which the Indians held some property interest. 465 U.S. at 468, 104 S.Ct. 1161. This included trust lands, individual allotments and, to a more limited extent, opened lands that had not yet been claimed by non-Indians. *Id.*[8]

The Supreme Court has established a "fairly clean analytical structure" for determining whether a surplus land act diminished a reservation or merely offered non-Indians the opportunity to purchase land within the boundaries of an established reservation. *Solem*, 465 U.S. at 470, 104 S.Ct. 1161. The first and governing principle is that "only Congress can divest a reservation of its land and diminish its

---

**8.** The Court noted that it was not until 1948 that Congress uncoupled reservation status from Indian ownership and defined "Indian country" by statute to include lands held in fee by non-Indians within reservation boundaries. *Solem*, 465 U.S. at 468, 104 S.Ct. 1161 (citing Act of June 35, 1948, ch. 645, § 1151, 62 Stat. 757 [codified at 18 U.S.C. § 1151] ).

boundaries." *Id.; see also, United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909). Diminishment will not be lightly inferred. *Solem,* 465 U.S. at 470, 104 S.Ct. 1161.

▮ Congress must clearly evince an "intent to change boundaries" before diminishment will be found. *Id.* (quoting *Rosebud v. Kneip,* 430 U.S. 584, 615 [1977]). The most probative evidence of congressional intent is the statutory language used to open Indian lands. *Solem,* 465 U.S. at 470, 104 S.Ct. 1161 "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands." *Solem,* 465 U.S. at 470, 104 S.Ct. 1161 (citing *DeCoteau,* 420 U.S. at 444–445, 95 S.Ct. 1082). Language of cession coupled with an unconditional commitment from Congress to compensate the tribe for its opened land creates "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Solem,* 465 U.S. at 470, 104 S.Ct. 1161.

▮ The Court stated, however, that explicit language of cession and unconditional compensation are not essential for a finding of diminishment. *Id.* Moreover, no particular set of words must be present for the court to find that there has been a diminishment. *Hagen v. Utah,* 510 U.S. 399, 411–12, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994).

▮ The historical context surrounding the passage of the act is also a factor to be considered. *Yankton Sioux Tribe,* 118 S.Ct. at 802; *Hagen,* 510 U.S. at 411, 114 S.Ct. 958; *Solem,* 465 U.S. at 471, 104 S.Ct. 1161. In *Solem,* the Court stated:

> When events surrounding the passage of a surplus land act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress—unequivocally reveal a widely-held contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged.

*Id.* at 471, 104 S.Ct. 1161. "Even in the absence of a clear expression of congressional purpose in the text of a surplus land Act, unequivocal evidence derived from the surrounding circumstances may support the conclusion that a reservation has been diminished." *Yankton Sioux Tribe,* 118 S.Ct. at 802 (citing *Solem,* 465 U.S. at 471, 104 S.Ct. 1161).

To a lesser extent, to discern Congress' intentions, courts look to events that occurred after the act's passage, such as the subsequent treatment of the land in question, particularly in the years immediately following passage, and the manner in which the United States Bureau of Indian Affairs and local judicial authority dealt with unallotted open lands. *Yankton Sioux Tribe,* 118 S.Ct. at 798 (citing *Hagen,* 510 U.S. at 411, 114 S.Ct. 958). "On a more pragmatic level," the Court has "recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation." *Hagen,* 510 U.S. at 411, 114 S.Ct. 958 (quoting *Solem,* 465 U.S. at 471, 104 S.Ct. 1161).

▮ Throughout the inquiry, any ambiguities are resolved in favor of the Indians. *Yankton Sioux Tribe,* 118 S.Ct. at 798; *Hagen,* 510 U.S. at 411, 114 S.Ct. 958; *Solem,* 465 U.S. at 470, 104 S.Ct. 1161; *see also, South Dakota v. Bourland,* 508 U.S. 679, 687, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) (" 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit' ") (quoting *County of Yakima v. Confederated Tribes and Bands of Yakima Nation,* 502 U.S. 251, 269 [1992] [internal quotation marks omitted] ).

The court will apply these principles to the facts of this case to determine whether the Act of 1871 clearly evinces congressional intent to diminish the boundaries of the Stockbridge–Munsee reservation. However, the court will initially address the issue of *stare decisis.*

The plaintiff contends that *stare decisis* principles are applicable because this court in two prior decisions has ruled in favor of the state's position and against the Tribe on the issue presented in this case.[9] In *United States v. Gardner,* 189 F. 690 (E.D.Wis.1911), a case involving a prosecution for rape, the defendant argued that the reservation as established in 1856 was disestablished in 1906, three years before the rape. Thus, the defendant argued that the rape did not occur on the reservation and that, therefore, the United States government lacked jurisdiction over him. The court analyzed provisions of the 1871 Act and concluded that the Tribe continued to occupy a reservation on the 18 contiguous sections reserved from sale. *Id.* at 693. The court examined the 1908 Act and concluded that the reservation was disestablished with the patenting in fee simple of the land in 1910.

In *United States v. Anderson,* 225 F. 825 (E.D.Wis.1915), the government sought to annul a conveyance of land based on its contention that trust restrictions over the lands remained. The court held that the reservation had been dissolved through the patenting of the lands comprising the reservation to tribal members pursuant to the 1906 Act. *Id.* at 825.

In *Colby v. J.C. Penney Company, Inc.,* 811 F.2d 1119, 1123 (7th Cir.1987), the court discussed the doctrine of *stare decisis.* The court noted that whether a decision is authoritative depends on various factors of which "the most important is the relationship between the court that decided it and the court to which it is cited later as a precedent." *Id.* at 1123. The simplest relationship is a hierarchical one. Thus, "decisions of a superior court in a unitary system bind the inferior courts."

*Id.* The most complex relationship is between a court and its own prior decisions. The court explained:

> A court must give considerable weight to those decisions unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling. *But it is not absolutely bound by them, and must give fair consideration to any substantial argument that a litigant makes for overruling a previous decision.*

*Id.* (emphasis added).

The court also acknowledged that in some cases different outcomes would place the defendant under inconsistent legal duties. Even in such situations, the court stated that "district judges in this circuit must not treat decisions by other district judges, in this and *a fortiori* in other circuits, as controlling, unless of course the doctrine of *res judicata* or of *collateral estoppel* applies. Such decisions will normally be entitled to no more weight than their intrinsic persuasiveness merits." *Id.* at 1124.

While the cases cited by the plaintiff may have some persuasive force, they are not binding on this court. Accordingly, in light of the foregoing, this court concludes that the doctrine of *stare decisis* is not applicable in this case.

 In seeking a preliminary injunction, the plaintiff asserts that the language of the Act of 1871 clearly reflects Congress' intention to diminish the Stockbridge–Munsee reservation. Specifically the plaintiff points to the language in the Act which indicated that the two townships set aside for the Tribe were to be replaced by a new home either on the 18 sections reserved from sale or elsewhere. Further, the Act provided that the 18 reserved sections were to become the Tribe's "permanent reservation" in the event that the Tribe chose not to locate elsewhere. The plaintiff asserts that had the Tribe elected to leave its Shawano County reservation,

---

**9.** The plaintiff acknowledges that the doctrine of *res judicata* does not apply in this case.

the Act provided that the remaining 18 sections were to have been sold at auction in the same manner as the 54 sections.

The plaintiff maintains that the Act of 1871 operated to divest the Tribe of all of its interests in the 54 sections which were to be sold at auction. The plaintiff points out that in *Minnesota v. Hitchcock*, 185 U.S. 373, 398, 22 S.Ct. 650, 46 L.Ed. 954 (1902), the Supreme Court determined that "all Indian rights had ceased" over the 54 sections when the Indians had removed from the land and had received other lands for their occupation. The plaintiff argues that cessation of "all Indian rights" is inconsistent with the continuance of reservation status.

The plaintiff asserts that the defendants utilize a mechanistic and simplistic approach to diminishment which focuses mainly on the presence or absence of "magic words" such as "cede," "relinquish," or "diminish." The plaintiff notes that the term "diminishment" did not become a term of art in Indian law until the early 1900s.[10] This approach, the plaintiff argues, cannot be reconciled with the decisions of the Supreme Court which have expressly stated that it has "never required any particular form of words before finding diminishment." *Hagen*, 510 U.S. at 411, 114 S.Ct. 958.

The plaintiff further asserts that the purpose of the 1871 Act differs from the purpose of the surplus land acts which were enacted to make unallotted land available to non-Indians, in part, to promote interaction between white settlers and tribal members and to encourage the assimilation of the Indians. In contrast, the aim of the Act of 1871 was to obtain the maximum revenue for the Tribe from the sale of the lands. According to the plaintiff, Congress was acting within the established precepts of the time under which the sale of three-quarters of the reservation—with no remaining tribal interest—was intended and understood to reduce the reservation boundaries. The plaintiff argues that Congress essentially implemented the key terms of the draft treaty of 1868 through the 1871 Act.

The plaintiff also asserts that the historical circumstances surrounding the enactment of the 1871 Act confirm Congress' intent to diminish the reservation. The plaintiff contends that these historical circumstances include the desire to open the area to commercial logging, the effort to address the on-going factionalism between the Citizen party and the Indian party, the language of the draft Treaty of 1868, and the common understanding at the time that extinguishment of a tribe's title and interest in land removed the reservation status of such lands. In addition, the plaintiff points out that the size of the Stockbridge–Munsee reservation was far larger than necessary to satisfy the promised allotments to tribal members,

According to the plaintiff, subsequent treatment of the land as evidenced by government documents, including the annual reports of the Commissioner of Indian Affairs to Congress, government maps, and legislation support its position that after the 1871 Act was enacted, the reservation was reduced to 18 sections and dissolved completely upon the final patenting of all of the land in the 18 sections as of 1910. In addition, the plaintiff asserts that case law of the time supports its position. Specifically, the plaintiff cites *Hitchcock*, 185 U.S. at 398, 22 S.Ct. 650 and *Beecher v. Wetherby*, 95 U.S. 517, 24 L.Ed. 440 (1877).[11]

---

**10.** In *Solem*, the Court noted: "In 1908, 'diminished' was not yet a term of art in Indian law. When Congress spoke of the 'reservation thus diminished,' it may well have been referring to diminishment in common law lands and not diminishment of reservation boundaries. Similarly, even without diminishment, unallotted open lands could be conceived as being in the 'public domain' inasmuch as they were available for settlement." 465 U.S. at 476 n. 17, 104 S.Ct. 1161 (citation omitted).

**11.** The plaintiff also cites *United States v. Gardner*, 189 F. 690 (E.D.Wis.1911) and *United States v. Anderson*, 225 F. 825 (E.D.Wis. 1915).

In *Hitchcock*, a case involving a school lands claim in Minnesota, the Court discussed *Beecher* [12] and the Act of 1871. The Court observed that with respect to 54 sections of the reservation, "the Indians had removed from the lands and had received other lands for their occupation; that hence all Indian rights had ceased." 185 U.S. at 398, 22 S.Ct. 650. The plaintiff also notes that in *State v. Davids*, 194 Wis.2d 386, 534 N.W.2d 70 (Wis.1995), the Wisconsin Supreme Court held that the two-township reservation was diminished by the Act of 1856 and subsequently disestablished.

Thus, the plaintiff asserts that the evidence indicating congressional intent to diminish and later disestablish the Stockbridge–Munsee reservation is compelling. Accordingly, the plaintiff concludes that the Tribe is not authorized to conduct Class III gaming at its Pine Hills casino because Pine Hills is located outside the boundaries of the present reservation.

In opposing the motion, the defendants assert that the plaintiff cannot show irreparable harm and a likelihood of success on the merits. Therefore, they contend that the plaintiff cannot meet the threshold requirement for preliminary injunctive relief. They also assert that the other relevant factors, including the balancing of harms and the public interest, weigh in their favor.

With respect to the plaintiff's likelihood of success on the merits, the defendants maintain that neither the language of the Act of 1871 nor its legislative history provide clear evidence of congressional intent to diminish the reservation. According to the defendants, the historical circumstances and subsequent treatment of the land by Congress also fail to support a finding of diminishment. They assert that

in the absence of substantial and compelling evidence, there can be no diminishment of the Tribe's reservation.

Specifically, the defendants contend that Congress was fully aware of the means by which termination could be accomplished and had used explicit cession language when that was the result desired. They assert that such express language is absent from the 1871 and 1906 Acts. The defendants also point out that the Act of 1871 does not include a second factor which provides evidence of diminishment, namely a provision for payment of a sum certain to the Tribe for the lands. The defendants assert that when Congress intended to diminish a reservation, typically the United States purchased the land, placed it in the public domain and then made it available for purchase by private parties. The Act of 1871 does not follow this pattern and does not provide that the reservation would be restored to the public domain.

The defendants assert that the events surrounding the passage of the 1871 Act do not indicate an intent to diminish the reservation. Rather, they argue that the Act was the result of manipulation of an existing inter-tribal conflict by Wisconsin lumbermen who wanted to obtain access to the pine forests on the reservation. The defendants point out that the legislative debate prior to the passage of the 1871 Act contains no discussion concerning how the legislation would impact on the reservation boundaries or affect jurisdiction over the opened lands.

The defendants also assert that Congress' subsequent treatment of the land, although of more limited relevance, does not support a finding of diminishment. The defendants contend that the adminis-

---

**12.** *Beecher* was an action in replevin to recover logs cut on a particular section of land. The title to the logs depended on the title to the land. The plaintiff was the purchaser of the property at auction pursuant to the Act of 1871 and the defendant claimed the land under the Wisconsin school grant. The Court held that the title of the defendant under the

school grant was superior to that of the plaintiff under the sale by the United States. 95 U.S. at 527. The Court stated that when the logs in suit were cut, the Stockbridge and Munsee Tribes "had removed from the land in controversy, and other sections had been set apart of their occupation." *Id.*

trative agencies' documents and maps after the enactment of the 1871 Act are ambiguous and unreliable. They acknowledge that the administrative record during the allotment era appears on the surface to support the plaintiff's position but that, in the modern era, the Secretary of the Interior has generally supported the Tribe's position. The defendants also note that, in the preamble to the Act of 1893, Congress affirmed that the Tribe had ceded certain lands to the United States and accepted other lands as a reservation to which the Tribe removed and "upon which they have resided ever since." (Exh. 9, ¶ 1).

They point out that, contrary to the experience of some other tribes, large numbers of non-Indians did not move to the area following the sale of 54 sections pursuant to the 1871 Act. The defendants also contend that the contemporaneous court cases cited by the plaintiff are not controlling precedent.[13]

The defendants stress that two well-established principles govern modern diminishment analysis: first, a reservation, once established, cannot be diminished without Congress' "clear and plain" intent to do so, and second, pursuant to 18 U.S.C. § 1151, the patenting of lands to Indians or non-Indians does not diminish a reservation. They argue that the plaintiff ignores these principles with respect to both the 1871 and 1906 Acts, and instead relies largely on the mistaken identification of reservation status with Indian title.

The defendants point out that the Supreme Court's diminishment cases mandate a careful, fact-specific review of the relevant factors in each case in which a diminishment is alleged, and that such a review in this case compels the conclusion that the Stockbridge–Munsee reservation was not diminished by the Act of 1871. They contend that the Supreme Court's decision in *Solem* closely parallels the facts and circumstances in the instant case and is controlling.

In *Solem,* the Supreme Court held that a surplus land act enacted by Congress in 1908 which authorized the Secretary of the Interior "to sell and dispose of" for homesteading a specified portion of the Cheyenne River Sioux Reservation did not diminish the boundaries of the reservation. 465 U.S. at 472, 104 S.Ct. 1161. Under the act, the proceeds of the sale were to be deposited in the United States Treasury to the credit of the Indians belonging to and having tribal rights on the reservation. *Id.* at 472–473, 104 S.Ct. 1161. The Court concluded that the operative language authorizing the Secretary of the Interior to sell and dispose of certain lands, in conjunction with the creation of Indian accounts for the proceeds did not result in a cession of tribal land. Rather, the Court found that these provisions suggested "that the Secretary of the Interior was simply being authorized to act as the Tribe's sales agent." *Id.* at 473, 104 S.Ct. 1161. The Court stated that precisely the same language was addressed in *Seymour v. Superintendent of Washington State Penitentiary,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962),[14] and that the Court

---

13. The defendants also contend that *State v. Davids,* 194 Wis.2d 386, 534 N.W.2d 70 (Wis. 1995) was wrongly decided and urge the court to follow the dissent in that case.

14. In *Seymour,* 368 U.S. at 354–355, 82 S.Ct. 424, the Court held that a 1906 Act providing for the sale of mineral lands and for the settlement and entry under the homestead laws of other surplus lands remaining on the Colville Indian Reservation did not diminish the reservation. The Court noted that in 1892, Congress had diminished the size of the reservation in an Act that "vacated and restored to the public domain" the northern half of the reservation. *Id.* at 354, 82 S.Ct. 424. "Nowhere in the 1906 Act is there to be found any language similar to that in the 1892 Act." *Id.* at 355, 82 S.Ct. 424. The Court also noted that the 1906 Act provided that the proceeds from the disposition of the lands were to be deposited in the United States Treasury to the credit of the tribe. *Id.* at 355–356, 82 S.Ct. 424. Finally, the Court observed that Congress and the Department of the Interior had explicitly recognized the continued existence of the reservation in the years following the 1906 Act. *Id.* at 356–357, 82 S.Ct. 424.

concluded that such provisions "did no more than to open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Solem*, 465 U.S. at 473, 104 S.Ct. 1161 (citing *Seymour*, 368 U.S. at 356, 82 S.Ct. 424).

The Court in *Solem* examined the balance of the 1908 Act and found that certain provisions strongly suggested that the unallotted opened lands would remain an integral part of the reservation for the immediate future. *Id.* at 474, 104 S.Ct. 1161. Some of the opened lands were set aside for agency, school and religious purposes. *Id.* The Court questioned why Congress would have reserved these lands for such purposes if it had not anticipated the opened land would remain part of the reservation.

The Court acknowledged that some language in the act indirectly supported the view that the reservation was diminished. However, language in subsequent portions of the act referring to the opened areas as being in the "public domain" and unopened areas as comprising the "reservation thus diminished" were not dispositive when balanced against the stated limited goal of opening up the reservation lands for sale to non-Indians settlers. *Id.* at 475–476, 104 S.Ct. 1161. The Court concluded that it was "impossible to infer from a few isolated and ambiguous phrases" in the legislative history that Congress intended to diminish the reservation. *Id.* at 478, 104 S.Ct. 1161.

The Court then looked to the circumstances surrounding the passage of the Cheyenne River Act and noted that the bill was initiated by a United States Senator and then brought to the tribe so that they could be consulted about the possible cession of their lands. *Id.* at 476, 104 S.Ct. 1161. However, before a decision was received from the entire tribe, a report was made to Congress which stated that the tribe was in favor of the relinquishment of the opened lands. *Id.* at 477, 104 S.Ct.

1161. The Court pointed out that the legislative history made no mention of the effect of the Act on the reservation's boundaries, nor was there clear evidence that the tribe had agreed to cede the open areas. *Id.*

The Court gave little weight to the subsequent treatment of the reservation finding it to be too "rife with contradictions and inconsistencies" to be of much use. *Id.* Finally, the court noted that two-thirds of the existing tribe now lived on the opened lands. *Id.* at 480, 104 S.Ct. 1161.

In *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), cited by the plaintiff, the Supreme Court held that the circumstances surrounding the passage of the Acts of 1904, 1907 and 1910 unequivocally demonstrated that Congress intended each act to diminish the Rosebud Reservation. *Id.* at 606–607, 97 S.Ct. 1361. In 1901, the Rosebud Sioux Tribe had voted in favor of an agreement to cede a portion of their unallotted land in exchange for a sum certain. The negotiated agreement was never ratified. *Id.* at 590–591, 97 S.Ct. 1361. Three years later, Congress passed the Act of April 23, 1904, which incorporated the agreement's cession language, but replaced the sum certain payment with a provision guaranteeing the tribe payment from the sale of the opened lands. The 1904 Act provided that the tribe did "cede, surrender, grant, and convey to the United States" all their right, title, claim, and interest in the certain remaining unallotted lands. *Id.* at 597, 97 S.Ct. 1361.

In 1907 and 1910, Congress passed surplus land acts involving other Rosebud Reservation lands. Each of the subsequent acts authorized the sale and disposal of additional lands and promised the tribes the proceeds of the sales. As the Court noted in *Solem*, "none of the Rosebud Acts clearly severed the Tribe from its interest in the unallotted opened lands." *Id.* at 469, n. 10, 104 S.Ct. 1161. The court noted that these latter two acts were "strikingly similar" to the 1906 Act which the Court in

*Seymour* found not to have diminished the Colville Reservation. *Id.* Nonetheless, the Court in *Rosebud Sioux* held that the circumstances surrounding the passage of the Acts unequivocally demonstrated that Congress intended each act to diminish the reservation. *Id.* at 606, 615, 97 S.Ct. 1361.

The Court also conducted a fact specific review of the statutory language and historical circumstances of a congressional act in *Yankton Sioux.*[15] In that case, the Court found that an 1894 Act which provided that the Yankton Sioux Tribe would "cede, sell, relinquish, and convey to the United States" all title, right and interest to the unallotted lands within the limits of the reservation in exchange for the sum of $600,000, resulted in diminishment of the reservation. 118 S.Ct. at 798. The Court stated that the manner in which the transaction was negotiated and the Presidential Proclamation opening the lands to settlement revealed a contemporaneous understanding that the act altered the boundaries of the reservation. *Id.* at 792. Little weight was given to the subsequent congressional and administrative references to the land because they were "inconsistent" and failed to reveal a "dominant approach." *Id.*

Similarly, in *Hagen,* the Court was called upon to determine whether Congress diminished the Uintah Indian Reservation by passage of the Act of 1902. The operative language provided for allocations of reservation land to Indians and further provided that "all the unallotted lands within said reservation shall be restored to the public domain." 510 U.S. at 412, 114 S.Ct. 958. The Court noted that statutes of the time indicated that "Congress considered Indian reservations as separate from the public domain." *Id.* at 413. Given the statutory language, contemporary historical evidence, and the subsequent treatment of the area, the Court concluded that Congress had diminished the reservation.

In *Mattz,* the Court addressed whether Congress diminished the Klamath River Reservation when it passed the surplus land act in 1892, which provided that the lands would be "subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands" under certain provisions. 412 U.S. at 495, 93 S.Ct. 2245. The proceeds from the sale of the lands constituted a fund to be used under the direction of the Secretary of the Interior for the "maintenance and education of the Indians now residing on said lands and their children." *Id.* The Court observed that both Congress and Department of Indian Affairs had repeatedly recognized the reservation status of the land after 1892. *Id.* at 505, 93 S.Ct. 2245. Based on its analysis of the operative factors, the Court concluded that the reservation was not terminated by the 1892 Act. *Id.* at 506, 93 S.Ct. 2245.

In the case before the court, the record reveals that the Stockbridge–Munsee Tribe had a history of involvement with white settlers well prior to their removal to Wisconsin in 1821. After their removal, conflicts arose within the Tribe between those who wanted to preserve traditional tribal community structures and culture, and those who wanted to relinquish tribal status in return for United States citizenship and individual allotments of land. At this time, and through most of the nineteenth century, the prevailing view was that tribal affiliation was inconsistent with the acquisition of United States citizenship.

This internal conflict between what came to be known as the Indian party, which wanted to preserve tribal status and

---

**15.** Similar cession language was used in an 1889 agreement between the Sisseton and Wahpeton Tribes and the United States which was ratified in an 1891 Act. The Supreme Court held that the reservation was terminated and returned to the public domain by the Act which also appropriated and vested in the Tribe a sum certain per acre in payment for the cessation and relinquishment of the tribe's claim, title and interest in the unallotted lands. *DeCoteau v. District County Court,* 420 U.S. at 445, 95 S.Ct. 1082.

culture, and the Citizen party, which favored relinquishing tribal status in return for United States citizenship and allotment of land, played a significant role in the Tribe's dealings with the federal government. This intra-tribal conflict between the two parties continued through the years. In the Act of 1843, Congress granted citizenship to members of the Tribe and provided for the partition and division of the lands. This Act had a brief existence and was repealed in 1846.

The Act of 1846 restored and re-established the Tribe's rights and privileges and also provided for the division of tribal lands into two districts: the Indian District and the Citizen District. The lands in the Citizen District were to be divided and allotted to each Indian who became a citizen and ultimately patents in fee simple would be issued. Under the Act, Indians who became citizens would forfeit any rights to receive any portion of the annuity which the Tribe might receive in the future. The lands in the Indian District were to be held in common.

In the Treaty of 1848, the Tribe renounced all participation in the benefits or privileges granted by the 1843 Act and declared themselves to be under the "protection and guardianship of the United States, as other Indian tribes." ("Treaty with the Stockbridge Tribe, 1848," 9 Stat. 955; Exh. 4, Art. 1). The Tribe agreed to "sell and relinquish" land to the United States in return for which the United States agreed to pay the Tribe a sum of money. The Tribe also agreed to remove to other land set aside for them. The treaty provided for the allotment of lands to those tribal members who had become citizens, and also provided that patents would be issued to them.

Conflicts continued within the Tribe. A majority of the Tribe did not want to relocate to other land, while other tribal members wanted to sever their relations with the Tribe and receive patents for the land which they occupied. The federal government again attempted to resolve this conflict between the Indian party and the Citizen party.

The on-going tribal conflict impacted the Treaty of 1856. The preamble to the treaty recounted the internal strife within the Tribe and the treaty recognized the division within the Tribe. Some members of the Tribe were adverse to removing to Minnesota and wanted to engage in agricultural pursuits at a new location in Wisconsin. Other tribal members wanted to sever their relations with the Tribe and receive patents for the land they occupied. The 1856 treaty, in part, was an effort to address these conflicting interests. As a result of the Treaty of 1856, a reservation consisting of two townships was established for the Tribe. A draft Treaty in 1868, in which the Tribe agreed to cede and relinquish all title and interest in 54 sections was never finalized.

The 1871 Act at issue in this case also addressed the ongoing intra-tribal strife. The Act provided that two townships of land "shall be advertised for sale ... and shall be offered at public auction." ("Act for the Relief of the Stockbridge and Munsee Tribe of Indians in the State of Wisconsin," 16 Stats. 404, Exh. 8, § 2). The Act authorized the Secretary of the Interior "to reserve from sale a quantity of said lands not exceeding eighteen contiguous sections, embracing such as are now actually occupied and improved, and are best adapted to agricultural purposes, subject to allotment to members of the Indian party of said tribe." (Exh. 8, § 2).

The proceeds from the sale of the land were to be divided between the Indian and Citizen parties in proportion to their numbers. The proceeds were to be allocated differently for members of the Indian party and members of the Citizen party. Proceeds belonging to the Citizen party were to be divided among the members per capita and paid out to the heads of families and adult members of that party. However, the sum belonging to the Indian party was to be credited to that party "on the books of the treasurer of the United

States," and the interest applied to certain areas, including the support of schools and the purchase of agricultural implements. (Exh. 8 ¶ 5). Part of the proceeds due the Indian party could be used for securing a new location for the Tribe.

Recognizing the division among tribal members, the 1871 Act created two rolls, the Indian roll and the Citizen roll, for the "purpose of determining the persons who are members of said tribes and the future relation of each to the government of the United States." (Exh. 8, § 6). The Citizen roll included those tribal members who expressed their desire to sever their relations with the Tribe and become United States citizens. After the members of the Citizen party received their proceeds, there was to be "a full surrender and relinquishment" of all their claims as tribal members and they would be admitted to "all the rights and privileges of citizens of the United States." (Exh. 8, § 6).

The Indian roll contained the names of tribal members who desired to retain their tribal character and "continue under the care and guardianship of the United States." (Exh. 8, § 6). The Act specifically provided that, after the rolls had been made and returned, the Indian party would be known as the "Stockbridge tribe of Indians" and "may be located upon lands."

The Supreme Court has clearly indicated that the effect of any land act depends upon the language of the particular act and the circumstances surrounding its passage. This court has given careful and deliberate consideration to the positions of the parties in light of the applicable law and the facts and circumstances of this case. The court acknowledges that the Act of 1871 does not explicitly state that the size of the Stockbridge–Munsee reservation was diminished, nor does the limited legislative history provide significant guidance.[16] Nonetheless, careful review of the provisions of the Act of 1871, its purpose, and the historical

context and events surrounding the passage of the Act, cause this court to conclude that Congress clearly intended to diminish the size of the Stockbridge–Munsee reservation to 18 sections by passage of the Act.

The Act of 1871 was designed to provide economic benefit to the Tribe and to open lands to lumbering interests for the legal harvesting of timber. Thus, it differed in purpose from the surplus land acts, which opened land to white settlers and also encouraged the assimilation and integration of tribes.

The Act recognized the continuing conflict within the Stockbridge–Munsee Tribe and clearly treated the two opposing factions—the Indian party and the Citizen party—in different ways. Citizen party members would relinquish their rights and claims as tribal members and have full rights of United States citizenship after they were paid the proceeds for the opened lands. The Indian party, which would be known as the "Stockbridge tribe of Indians," obtained eighteen sections reserved from the sale, and had the option to move to a new location in the future. The members of the Indian party could remain on the eighteen sections or "such other reservation" as might be procured for them with their consent, indicating that the eighteen sections constituted the reservation.

If the Tribe decided to move to a new location, the reservation status of the two townships would have ceased, because the Act clearly contemplated the establishment of one reservation for the Tribe. Contrary to the defendants' contentions, this conclusion is buttressed by the clear reading of the Act and the treatment accorded the Citizen party and the Indian party under its provisions.

The Citizen party members would be paid out of the proceeds and granted United States citizenship upon relinquishment

---

**16.** The lack of explicit language of cession, however, does not preclude a finding of diminishment. *See Hagen,* 510 U.S. at 411– 412, 114 S.Ct. 958; *Solem,* 465 U.S. at 470, 104 S.Ct. 1161.

of their claims as members of the Tribe. Conversely, the Indian party members who wanted to remain under the care and guardianship of the United States were provided with eighteen contiguous sections, reserved from the sale, for a reservation. If they chose to relocate to a new area, another "reservation" would be procured for them.

Moreover, the Act provided for the payment of a definable sum to tribal members, although the manner of distribution of these proceeds varied based upon party affiliation. The land, with the exception of the eighteen sections, was to be sold at public auction for not less that the appraised value in lots not exceeding eighty acres each. The unsold lands would not be retained by the Tribe. Rather, the Act provided that lands remaining unsold after one year were again to be offered at public auction for not less than the minimum of one dollar and twenty-five cents per acre. The value of any lands remaining unsold after the last public sale, about 60 cents per acre, were to be included in the total amount due the Tribe from the United States.

There is a clear distinction in the manner in which the two tribal factions were compensated for the opened lands. The proceeds payable to the Citizen party were to be divided equally on a per capita basis among the members and paid out to the heads of families and adult members of that party. In contrast, in *Solem*, the proceeds from the sale and disposition of the lands were to "be deposited in the Treasury of the United States, to the credit of the Indians belonging and having tribal rights on the reservation." 465 U.S. at 473, 104 S.Ct. 1161; *see also, Mattz,* 412 U.S. at 495, 93 S.Ct. 2245 ("the proceeds arising from the sale of said lands shall constitute a fund to be used under the direction of the Secretary of the Interior for the maintenance and education of the Indians now residing on said lands and their children."); *Seymour,* 368 U.S. at 355, 82 S.Ct. 424 (proceeds from the disposition of the land to be "deposited in the Treasury of the United States to the credit" of the tribes.)

The amount belonging to the Indian party, on the other hand, was to be credited to it "on the books of the treasurer of the United States." (Exh. 8, § 5). Thus, there was a clear and distinct commitment from Congress to compensate the Tribe for its opened lands. Moreover, unlike the situation in *Solem*, the operative language, when considered with the manner of distribution of the proceeds to the Citizen party, does not compel the conclusion that the Secretary of the Interior was acting as the Tribe's "sales agent." *See Solem,* 465 U.S. at 473, 104 S.Ct. 1161.

The federal government's treatment of the reservation immediately following the passage of the Act, as well as historical documents also support the conclusion that Congress intended to reduce the size of the reservation. In the annual report to Congress on November 1, 1872, the Commissioner of Indian Affairs reported, with regard to the Tribe, that "steps are now being taken to dispose of all of their reservation with the exception of eighteen sections ... which are reserved for their future use." (Exh. 337 at 304).[17] Although the parties agree that this language is contained in the report, the defendants argue that it should be discounted because it contains inconsistencies.[18] While there may be some inconsistencies in the contemporaneous reports, the reports considered together support the conclusion that the reservation was diminished.

---

**17.** The Commissioner also reported that the "reservation of this tribe now contains about 11,500 acres." (Exh. 337 at 306).

**18.** The written portion of the Report of the Commissioner of Indian Affairs dated November 1, 1872, lists acreage which is inconsistent with the figure set forth in Exhibit 337. The figure in the written report is also inconsistent with the acreage listed in the table to that report. (Exh. 327A, Report of the Commissioner of Indian Affairs dated November 1, 1872 at 408, 784).

Other annual reports to Congress reinforce the court's determination since they describe the reservation in similar terms. In his annual report for the year ended September 30, 1872, from William T. Richardson, the United States Indian Agent October 18, 1872, Mr. Richardson reported that the "reservation of this tribe now contains about 11,500 acres ... the balance of their lands having been disposed of by act of Congress February 6, 1871." [19] (Exh. 327A, United States Indian Department, Green Bay, Wisconsin, Report of October 18, 1872 at 591).[20]

The Report of the Commissioner of Indian Affairs dated November 1, 1877, contains a schedule showing the acreage and square miles of certain reservations. The schedule states that the Stockbridge reservation is eighteen square miles and 11,520 acres. (Exh. 327A, Report of the Commissioner of Indian Affairs dated November 1, 1877 at 700–701).

The Reports of Agents in Wisconsin included in the record contains a handwritten notation, "1881" and states that the Stockbridges, "numbering 135, are located on a reservation ... containing eighteen sections of land, which is considered fair for agricultural purposes." (Exh. 327A, Reports of Agents in Wisconsin at 179).[21] The report notes that the Tribe has one school and one church of the "Presbyterian denomination" which is presided over by a member of the Tribe who is also the teacher at the school. *Id.* Similarly, the Annual Report of the Commissioner of Indian Affairs to Congress in 1886, which includes the report from the Green Bay Agency in Keshena, Wisconsin, states that the "Stockbridge and Munsee Reservation contains a little over a half township of land." (Exh. 327A, Annual Report of the Commissioner of Indian Affairs, 1886 at 250).

The Annual Report of the Commissioner of Indian Affairs in 1887 states that the "Stockbridge and Munsee reservation consists of 18 sections of land adjoining the Menomonee Reservation on the south and west, on which reside the remnant of the once powerful tribe of Stockbridge and Munsee Indians, now numbering 136 people." (Exh. 327A, Annual Report of the Commissioner of Indian Affairs, 1887 at 287 [unnumbered]). The Fifth–Eighth Annual Report of the Commissioner of Indian Affairs in 1889 states: "This tribe [Stockbridges and Munsees] numbers 138 and occupy [sic] a reserve of 18 sections, or 11,520 acres." (Exh. 327A, Fifty–Eighth Annual Report of the Commissioner of Indian Affairs, 1889 at 300). The Fifty–Ninth Annual Report of the Commissioner of Indian Affairs in 1890 also refers to the Stockbridge Reservation as "consisting of eighteen sections." (Exh. 327A, Fifty–Ninth Annual Report of the Commissioner of Indian Affairs, 1890 at 234).

Similarly, in the annual Reports of Agents in Wisconsin dated August 21, 1893, it is reported that the Tribe, "an offshoot of the once powerful Six Nations of New York ... now number only 141, located upon half a township." (Exh. 327A, Reports of Agents in Wisconsin dated August 21, 1893 at 341). A Report of the Secretary of the Interior to Congress in 1894 states that the Stockbridge Reservation contains "about 18 sections of land." (Exh. 327A, Report of the Secretary of the Interior, 1894 at 329); *see also*, (Exh. 327A, Reports of Agents in Wisconsin dated September 1, 1896 at 321 ["Reservation

**19.** The cover sheet to the cited material states that it is a report to the Forty–Second Congress for the years "1872–73."

**20.** Exhibit 327A is loose collection of assorted pages of the Annual Reports of the Commissioner of Indian Affairs, and congressional and other documents spanning the period from 1854 to 1946. The pages are not Bate-stamped or otherwise sequentially numbered.

Therefore, the court has cited to the page numbers on the document.

**21.** Although the reports of agents appear to be part of the Annual Reports from the Commissioner of Indian Affairs, the exhibits do not always contain the title page of the document. In those instances, the court has cited to the heading contained on the particular page of the exhibit.

consists of 18 sections of Government land, or about 11,520 acres."] ); (Exh. 327A, Reports of Agents in Wisconsin dated July 16, 1897 at 301 ["The Stockbridge and Munsee Reservation consists of 11,500 acres of land."] ).

Similar descriptions of the land comprising the Stockbridge–Munsee Reservation are included in the Annual Reports of the Department of the Interior to Congress in 1900, 1901, 1902, 1904, 1905, 1906 (Exh. 327A [1900 Report] at 404; Exh. 327A [1901 Report] at 40; Exh. 327A [1902 Report] at 370; Exh. 327A [1904 Report] at 368; Exh. 327A [1905 Report] at 371; Exh. 327A [1906 Report] at 170).

The record before the court shows that Congress was clearly advised that the Stockbridge–Munsee Reservation had been diminished as a result of the passage of the 1871 Act. Moreover, the contemporary understanding was that the Act had resulted in diminishment.

Maps produced by the General Land Office which date from the early 1870's to 1886 show a diminished reservation comprised of 18 sections. *See* Exh. 323–326. An 1885 letter from the Commissioner of Indian Affairs refers to the "diminished" reserve. (Exh. 341 at 2). A March 21, 1904, letter from the Commissioner of Indian Affairs informs the United States Attorney in Milwaukee, Wisconsin that federal jurisdiction extends to the listed sections "which compose the present reservation." (Exh. 360 at 2).

Thus, the court's conclusion that the reservation was diminished in 1871 finds support in the subsequent treatment of the reservation by governmental agencies and Congress. The treatment of the area by Congress, particularly in the years immediately following the opening of the land has some evidentiary value, as does the way in which the Bureau of Indian Affairs and local judicial authorities dealt with the opened lands. *Solem,* 465 U.S. at 471, 104 S.Ct. 1161.

Evidence of contemporaneous understandings about the status of the reservation has marginal relevance. It provides minimal assistance in determining congressional intent in 1871. Such evidence in this case is limited and does not enlighten this court's analysis.

Given the court's conclusion and the fact that the Pine Hills casino does not lie within the 18 sections reserved from sale pursuant to the Act, the court need not decide whether the Act of 1906 disestablished the Stockbridge–Munsee Reservation. Having concluded that the Act of 1871 diminished the Stockbridge–Munsee Reservation, the court finds that the plaintiff's have a reasonable likelihood of success on their motion for preliminary injunction. The remaining factors necessary for the granting of a preliminary injunction will now be addressed.

■■■ The plaintiff argues that it has no adequate remedy at law because the Tribe's sovereign immunity bars the state from recovering damages, citing *Kiowa Tribe of Okla. v. Manufacturing Tech., Inc.,* 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). The plaintiff maintains that the equitable remedies of injunctive and declaratory relief are, therefore, its only avenues for obtaining relief. The defendants do not challenge this assertion. Rather, they insist that the plaintiff has not shown a "harm" at this stage of the proceedings and that it can easily wait until the completion of the trial to obtain relief.

The defendants point out that, given the plaintiff's sovereign immunity, they would suffer irreparable harm because they would be unable to recover money damages. They argue that the Tribe, a sovereign entity, would suffer economic harm if a preliminary injunction were to be issued

Since both the plaintiff and the Tribe are sovereign entities, both parties have limited remedies. However, the fact that the Tribe has sovereign immunity, when considered in conjunction with the nature of the plaintiff's interests, and given the plaintiff's reasonable likelihood of success on the merits, the plaintiff has established

that it will suffer irreparable harm if the preliminary injunction is not issued. The plaintiff also no adequate remedy at law.

This does not end the inquiry. The court must now engage in a "sliding scale" analysis by balancing the harms to the parties. *Roth,* 57 F.3d at 1453; *Abbott Laboratories,* 971 F.2d at 11. The court must consider the irreparable harm the nonmoving party will suffer if the preliminary relief is granted, balanced against the irreparable harm to the moving party if the relief is denied. *See Abbott Laboratories,* 971 F.2d at 11. The court must also consider the public interest. *Id.*

The plaintiff argues that the balancing of harms is less important in cases where the plaintiff is a sovereign state, citing *People of State of Ill. v. City of Milwaukee,* 599 F.2d 151, 166 (7th Cir.1979), *rev'd on other grounds,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). The plaintiff also contends that it has a strong interest in enforcing its criminal gambling laws. It asserts that the court need not conduct a balancing of harms because the defendants' violation of the gaming compact has been willful. In *United States v. Bethlehem Steel Corp.,* 38 F.3d 862, 868 (7th Cir.1994), cited by the plaintiff, the court stated that it "is an acceptable equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful." *Id.* (citing *EPA v. Environmental Waste Control,* 917 F.2d 327 [7th Cir.1990], *cert. denied,* 499 U.S. 975, 111 S.Ct. 1621, 113 L.Ed.2d 719 [1991]).

The plaintiff maintains that the Tribe would suffer minimal financial loss and that few tribal members will be affected if a preliminary injunction were granted since only a small number of tribal members actually are employed at Pine Hills. The plaintiff acknowledges that gaming is profitable, but points out that injunctions would never issue if lost income were viewed as a significant irreparable harm.

The defendants disagree with the plaintiff's position. They assert that, on balance, the harm which the Tribe will suffer

is tangible and concrete. As examples of such harm, the defendants cite the loss of income to the Tribe, lost wages to tribal members, the risk of business failure prior to the court's disposition of this matter and injury to the Tribe's sovereign right over its reservation territory. The defendants contend that denial of the plaintiff's motion would protect the jobs of the 30 to 50 individuals who depend upon gaming at Pine Hills for their livelihood. They assert that any harm to the plaintiff is abstract and outweighed by the Tribe's interest in the continued operation of Pine Hills pending final disposition of this matter.

The balance of the hardship in this action favors the plaintiff. Although individual tribal members who are employed at the casino may be affected by the granting of an injunction, that hardship is outweighed by the harm to the plaintiff. Moreover, the more likely a plaintiff is to win, the less heavily need the balance of harms weigh in its favor to obtain the injunction. *See Ping,* 870 F.2d at 1371–72.

Finally, the public interest must be considered. The plaintiff argues that the public has an important and a substantial interest in curtailing the proliferation of illegal gambling. While acknowledging that the public has an interest in full employment, the plaintiff maintains that there is no public interest in employment which result from violations of state law.

The defendants assert that gaming has provided the Tribe with a livelihood that has enhanced tribal self-determination, diminished tribal dependence on public funds and has provided employment for tribal members and others. Relying on *United States v. Santa Ynez Band of Chumash Mission Indians,* 983 F.Supp. 1317, 1326 (C.D.Cal.1997), the Tribe insists that this court should not impose a severe hardship on the Tribe and others who have based their livelihood on Indian gaming.

Notably, the plaintiff has an important interest in the enforcement of its criminal laws. *See Trainor v. Hernandez,* 431 U.S. 434, 444, 97 S.Ct. 1911, 52 L.Ed.2d 486

(1977); *see also e.g., Pennzoil Company v. Texaco, Inc.* 481 U.S. 1,12–13, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Moreover, the facts of *Santa Ynez Band* are clearly distinguishable from the facts presently before the court. Therefore, upon careful consideration, the court concludes that the interest of the public lies in favor of granting injunctive relief given the public's important interest in the enforcement of its gaming laws and the plaintiff's likelihood of success on the merits.

Accordingly, in light of the foregoing, this court will grant the plaintiff's motion for a preliminary injunction. A telephone status conference to discuss further matters in this case will be held on Wednesday, October 27, 1999, at 3:00 p.m. The court will initiate the telephone conference call.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the plaintiff State of Wisconsin's motion for a preliminary injunction is be and hereby is **granted.**

**IT IS FURTHER ORDERED** that a telephone status conference will be held on Wednesday, October 27, 1999, at 3:00 p.m. The court will initiate the telephone call.